300 F.2d 270
 INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 653, and
International Association of Bridge Structural and
Ornamental Iron Workers, Local 600, Appellants,
v.
BAY CITY ERECTION COMPANY, Inc., Appellee.
 No. 19187.
 United States Court of Appeals Fifth Circuit.
 March 20, 1962.
 
 Joseph M. Powers, Donald E. Brutkiewicz, Pierre Pelham, Mobile, Ala., for appellants.
 Willis C. Darby, Jr., Mobile, Ala., for appellee.
 Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.
 TUTTLE, Chief Judge.
 
 
 1
 This is an appeal by the International Union of Operating Engineers, Local 653 from a judgment of the district court based on a jury verdict for $50,000 damages recovered by the plaintiff, Bay City Erection Company, Inc., for the breach of a no-strike clause in a standard form collective bargaining agreement between the Bay City Company and the Mobile Building and Construction Trades Council 'in behalf of its constituent Locals,' of which the appellant Local was one. The District Court had jurisdiction of the cause under Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A. 185(a).
 
 
 2
 The grounds of appeal are primarily that there was insufficient proof to warrant submission to the jury of the issue of damages other than on a nominal basis, and that the cause of action was against Mobile Building and Trades Council rather than the constituent Locals. The appellant was sued jointly with, and the judgment went jointly against, International Association of Bridge, Structural and Ornamental Ironworkers Local No. 600. Local 600 has since dismissed its appeal in this Court so that it is no longer a party to the cause.
 
 
 3
 The appellant does not seriously challenge, and in fact does not assign as error, the finding of the jury and the judgment of the court to the effect that there was a breach of the no-strike provision of the contract. A cursory glance at the record would indicate that such a contention, if made, would be unsuccessful. It is conceded in the appellant's brief that after some dispute touching on working conditions had arisen between Bay City and the Local, the membership of the Local voted to request the Council to cause Bay City to be placed on the 'unfair list.' This was done. Thereafter the Council notified all general contractors in the geographical area in which it was operating that the appellee had been placed on the unfair list. It was not disputed that such general contractors knew that the effect of this was that they would contract with Bay City at their peril, in that Bay City would not be able to get members of the Locals to work for them in their construction projects. In fact, the business agent of appellant, Local 653, testified that under the standard collective bargaining agreement a fair contractor was supposed to stop doing business with a contractor who was on the unfair list and, further, that a member of appellant Local who worked for an unfair contractor was subject to fine.
 
 
 4
 The record discloses without much doubt that the blacklisting was successful in that it made it impossible for Bay City to continue its operations in the normal manner. Its principal crane operator was repeatedly called off the job, and was fined for working for Bay City; Bay City was unable to get a replacement for the crane operator and oiler and the Local, through which Bay City was required to obtain its men under the collective bargaining agreement, refused to furnish any men to it. Coincidentally with these actions by this appellant, Local 600 also refused to furnish its iron workers on Bay City's jobs. As a result of this joint action Bay City was required to use foremen to do the worker's jobs and even this caused members of the two Locals and other employees of general contractors working on the same job to leave their work. It was testified that the efficiency of the structural men doing rodmenhs work, for instance, on a particular job was less than fifty percent. Constant visits by representatives of one or the other Locals also caused extensive work stoppages on the various jobs not only by employees of Bay City, but also by employees of the general contractors on whose jobs Bay City was working. The stockholders of Bay City undertook to finish some of the jobs they were engaged on by operating under a different name and they further sought to obtain new contracts under the alternate name.
 
 
 5
 Officers of Bay City testified that during the year 1959, although they were on the unfair list for approximately one month, the corporation had a net profit of $12,622.71. They testified that during the year 1960 they bid but were unable to obtain much work in Mobile and vicinity after being placed on the unfair list. Officers testified that they had to leave Mobile to obtain work after being placed on the unfair list. They sought contracts in Georgia, Florida and Mississippi. Thereafter one of the Locals requested the Council to notify affiliated Councils around the United States that Bay City was on the unfair list. During the year 1960 the corporation suffered a net loss of $31,188.78. It was still on the unfair list at the time of the trial.
 
 
 6
 Dealing first with the contention that the breach of contract, if any, was caused by the Council, and it would be liable rather than the Local, we conclude that the stipulation and the concession made by counsel in its brief here give a complete answer to this proposition. It was stipulated in the trial court 'that the Mobile Building & Construction Trades Council is the body authorized to negotiate collective bargaining agreements for Local 653, and that was effectuated on July 2, 1959, when a collective bargaining agreement was signed.' Furthermore, in the appellanths brief it is stated, 'The Council signed the agreement in behalf of its constituent Locals.' Moreover, it is not disputed that whatever action the Council took with respect to placing Bay City on the unfair list it dis so at the request of the Locals. Besides, the Locals, through their agents, constantly and persistently acted in bringing about the work stoppages and in threatening the other contractors and prospective customers of Bay City. Appellant cites no case for the proposition that under such circumstances the local union itself is not liable for the breach of the no-strike clause of the contract.
 
 
 7
 Turning next to the question of damages, we find that although there was specific proof which would permit the jury to find that some part of the total award resulted from some specific inefficient operations because workers were not supplied by the defendant unions, as required in the contract, and because foremen were required to carry on work otherwise performed by workers supplied by the union locals, and because expensive equipment belonging to the appellee could not be used because operators were denied the right to work for appellee, much the greater part of the award by the jury must necessarily have represented lost profits resulting from the activities of the Local. It being abundantly clear that economic pressure, amounting if necessary to the destruction of the Bay City Company, was the purpose of the defendant Locals, we think the language of the United States Supreme Court's opinion in Story Parchment Co. v. Patterson Paper Company, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, is here apposite:
 
 
 8
 'It is true that there was uncertinty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount.
 
 
 9
 'Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. (citing cases). As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party.
 
 
 10
 'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery.'
 
 
 11
 The Court of Appeals for the Sixth Circuit, in United Mine Workers of America v. Osborne Mining Co., 279 F.2d 716, cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103, cites the Supreme Court's opinion in Story Parchment Co., supra, as a basis for its decision holding that the loss of future profits is properly considered where a violation of Section 303 of the Labor Management Relations Act, 29 U.S.C.A. 187(a)(1, 2) and 187(b), was charged. Although the United Mine Workers contended that the employer should recover only nominal damages, the Court of Appeals affirmed an award for compensatory damages, including an estimate of lost profits. Although this suit was brought under Section 303 of the Act, we think the same measure of damages should be used. See also, in this connection, W. L. Mead, Inc. v. International Brotherhood, etc., 129 F.Supp. 313 (D.C.Mass.), aff. 230 F.2d 576, and Standard Machinery Co. v. Duncan-Shaw Corporation, 1 Cir., 208 F.2d 61.
 
 
 12
 In deciding the substantiality of the evidence of damage, we consider the effective way in which the two Locals caused immediate shutdowns of the work performed by Bay City and work stoppages on construction projects on which Bay City was a subcontractor, together with the fact that the jury could infer that Bay City was almost completely shut out of the opportunity to obtain any contracts in the Mobile area for the entire year 1960 and down to the date of trial in 1961. We note the testimony that the officers were all experienced men in their type of operations and that they tried to obtain contracts outside of the state of Alabama in order to compensate for the loss of business occasioned by the activities of the defendants. We consider the difference in the financial operations as indicated by a profit of over $12,000 in the year 1959, and a loss of over $31,000 in the year 1960. We also recognize that the jury could find that it would take some time even after the end of the blacklisting, which had not yet occurred at the date of trial, for the company to re-establish its competitive position in the Mobile area as well as elsewhere. We conclude that there was ample evidence before the jury to support its finding of a $50,000 verdict.
 
 
 13
 We do not think that any harmful error occurred by the trial court's admission of the two bits of documentary evidence complained of.
 
 The judgment is
 
 14
 Affirmed.